## UNITED STATES v. CERTAIN PARCELS OF LAND IN CITY OF BALTIMORE, MD., et al.

### No. 2113.

District Court, D. Maryland.

June 16, 1945.

See, also, 55 F.Supp. 257.

Wilmer H. Driver, Sp. Asst. to Atty. Gen., for the United States.

Mason P. Morfit, Charles G. Page, and Edwin Harlan, all of Baltimore, Md., for Pullman-Standard Car Mfg. Co.

Simon E. Sobeloff, City Sol., and A. A. Davis, Asst. City Sol., both of Baltimore, Md., for Mayor and City Council of Baltimore.

CHESNUT, District Judge.

This is a federal condemnation case involving the land, buildings and personal property in Baltimore City of the Pullman-Standard Car Manufacturing Company, a corporation, which had been leased to the Bethlehem-Fairfield Shipyards, Inc. The only question in the case remaining for disposition is the disputed right of the Mayor and City Council of Baltimore to be paid its claim for State and City real estate taxes on the property for the year 1945 in the amount of $30,596.36, from the balance of the fund now in court deposited on May 25, 1945 by the United States Government in payment of the full and absolute title to the property free of liens. The City asserts that this amount of City and State taxes became a lien on the property on January 1, 1945. The former owner of the property, Pullman-Standard Car Manufacturing Company (hereinafter sometimes referred to as Pullman) disputes this contention. The answer to the question must be based on a correct understanding of the tax laws of the State and City and the precise nature and effect of the condemnation procedure in this particular case.

First, as to the procedure. On December 2, 1943, the United States filed its petition for condemnation of the property which was then under lease from the owner, the Pullman Company, to the Bethlehem-Fairfield Shipyards, Inc. (hereinafter sometimes referred to as Bethlehem). The latter was operating the plant for shipbuilding purposes under a "government owned facilities contract". The lease between Pullman and Bethlehem was dated March 18, 1941, to end on March 31, 1943, with the option to the lessee to renew from year to year

for a stated period thereafter. When the condemnation suit was first filed the lease had been renewed to expire March 31, 1944. The yearly rental was $260,000, and in addition the lessee was required to pay the taxes and water charges.

In its petition to condemn the government limited the interest or estate to be taken to a leasehold estate and not the fee. The interest sought to be taken was described as "the exclusive use and occupation of the hereinafter described lands, together with all buildings and structures located thereon, etc., * * * for a period ending one year from the date of institution of this condemnation proceeding, and at the election of the United States Maritime Commission, for additional yearly periods thereafter during the present state of war and one year thereafter. * * *." Contemporaneously with the filing of the petition for condemnation, the Maritime Commission, acting for the United States, instructed the then lessee, Bethlehem, that it should continue to operate the property not as lessee from Pullman but as agent for the government. The authority for this action was based on the Second War Powers Act, 50 U.S.C.A.Appendix § 632.

■■■ It is quite important in this case to note that the petition for condemnation was filed under authority of 40 U.S.C.A. §§ 257, 258, which made applicable the Maryland statutory procedure in condemnation cases. Md.Code, 1939, Art. 33A. It is also very important to note that the government made no deposit with the court under the provisions of 40 U.S.C.A. § 258a. The new federal civil procedure rules are not applicable to federal condemnation cases except on appeal. Rule 81(a) (7), 28 U.S.C.A. following section 723c. Under the Maryland condemnation procedure title to the property sought to be condemned does not pass to the condemnor until just compensation is paid or secured. Md.Code 1939, Art. 33A, § 13; Dunne v. State, 162 Md. 274, 284, 159 A. 751, certiorari denied 287 U.S. 564, 53 S. Ct. 23, 77 L.Ed. 497; Record B. & L. A. v. Safe Deposit & Trust Co. Trustee, 166 Md. 348, 351, 171 A. 43; 29 C.J.S., Eminent Domain, § 192, p. 1092. In the absence of a controlling statute to the contrary, the federal rule is the same. Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 84 L.Ed. 240.

In its plea or answer to the petition for condemnation the Pullman Company denied the right of the government to take the property for the indeterminate period described in the petition. In replying the government in effect demurred to the property owner's answer. As a result of extended argument of counsel on the pleadings the court reached the conclusion that as tested by the rules of Maryland pleading which are here applicable, the government's petition was insufficient in definiteness and certainty for the particular reason indicated in the opinion which made an extended review of the case up to that point. 55 F.Supp. 257. The then order of the court was to sustain the owner's objections to the petition as a sufficient pleading but leave to amend within thirty days was given. An amended petition was filed on June 8, 1944, and Pullman's demurrer thereto was overruled. On September 30, 1944, the government filed a second amendment to the petition for condemnation in which it then for the first time asked for a condemnation of the absolute interest in the property. Leave to file this second amendment was opposed by Pullman and on December 29, 1944, after a hearing the court refused permission to make the amendment because it attempted to have retroactive effect with respect to the desired taking of the absolute fee interest back to December 2, 1943, when the original petition had been filed. However, permission to further amend the government's petition of September 30, 1944 was given, and on January 8, 1945, amendment was made which abandoned the retrospective effect of the proposed amendment and made it prospective only. On March 8, 1945 a memorandum opinion was filed stating the reasons for the allowance of the amended petition of September 30, 1944 as further modified. The Pullman Company continued to resist and oppose the government's condemnation petition. It demurred to the amended petition and when this was overruled it answered on March 29, 1945.

Finally, on May 15, 1945, Pullman and the United States, and Bethlehem as lessee, made an agreement of settlement and filed a stipulation that the government pay into court $1,500,000 for the full and absolute title to the property, in consequence of which on the same date an order of court, approved by counsel for the government, for Pullman and for Bethlehem, was entered which read in part:

"And it is further ordered, adjudged and decreed that upon deposit in the registry of

this court by the United States of America of the said sum of $1,500,000, the indefeasible fee simple title absolute to said real property and the absolute title to said personal property and the right to the use and occupancy of the hereinabove described property, *free and clear of all liens,* encumbrances and charges of whatsoever nature, and free and clear of all servitudes and easements excepting the easements and restrictions mentioned in the description of said land in the petition for condemnation filed herein, shall vest in the United States of America." (Italics supplied.)

The deposit of $1,500,000 was made on May 25, 1945. Baltimore City had throughout been made a party to the case and had given notice of its tax claim. On May 25, 1945, a further stipulation was filed signed by counsel for all the parties, which provided—

"that the proper sum to be retained in the registry of the District Court of the United States for the District of Maryland pending the final determination of the disputed claim of the Mayor and City Council of Baltimore for State and City taxes for the year 1945 and for water charges on property condemned in the above entitled proceeding is the sum of thirty-three thousand nine hundred and seventy-one dollars and seventy-nine cents ($33,971.79)."

Thereupon on petition of counsel for Pullman the sum of $1,500,000 less the reserved amount of $33,971.79, was paid to Pullman by the clerk of the court under order of court. During the pendency of the litigation the State and City taxes for 1944 had been paid by Pullman and very recently the water charges in the amount of $3,375.43 have been paid by Bethlehem. This latter amount is now presumably payable to Pullman; but the item in dispute is the State and City taxes for 1945 in the amount of $30,596.36.

Briefly summarized, the procedure in the case was this. From December 2, 1943 until May 25, 1945 the case was an ordinary condemnation case in which the government first sought to condemn only a leasehold interest; and then on September 30, 1944 proposed to convert the extent of the desired taking into an absolute fee. Throughout this period the right of the government to condemn the property was uniformly and consistently opposed by the property owner. The possession of the property by the government throughout this period was under the authority of the Second War Powers Act. No deposit was made by the government until May 25, 1945 and then only as a result of the agreement for settlement fixing the amount of damages to be paid for the property free of liens. The petition of the government for amendment of the extent of the taking, from a leasehold interest to an absolute fee, first filed on September 30, 1944, was not allowed actually until March 8, 1945, and after its further amendment on January 8, 1945.

Now, as to the local tax system. This has been outlined in at least two prior decisions of this court. In re Wells, D.C., 4 F.Supp. 329; Supplee v. Magruder, Collector, D.C., 36 F.Supp. 722, affirmed 4 Cir. 123 F.2d 399, but reversed on other grounds 316 U.S. 394, 62 S.Ct. 1162, 86 L.Ed. 1555. The tax claim here includes both City and State taxes and there are minor differences in the local legislation with respect to the two; but they are not controlling or even important in this case and no point has been made of this difference by counsel for Pullman. The City portion of the bill represents about 95% of the whole. It is not disputed that if the tax claim attached at all it became a lien on the property January 1, 1945, and its status so continued until the deposit in court made on May 25, 1945, pursuant to stipulation of all parties. Md.Code, 1939, Art. 81, § 72, and Act of 1944 Extra Session, Chap. 7, § 1; Md. Code, Art. 81, § 71A. With respect to the City taxes the local system was briefly summarized in the opinion In re Wells, 4 F.Supp. 330:

"In substance the local tax system with respect to this class of taxes is that October first of each year is fixed as the 'date of finality' for valuation and assessment of property to control for the ensuing calendar year. The taxable basis being thus fixed as nearly as possible, an 'ordinance of estimates' is then passed, and, as soon as practicable thereafter in the month of November, there is another ordinance fixing the rate of taxation for the ensuing year. The City taxes become 'due and payable' on January 1st of each year and become in arrears on July 1st thereafter. While October 1st preceding the calendar tax year is made the 'date of finality' so far as possible for the valuation of property and the liability of the assessed individual to pay taxes thereon for the following year, it has been clearly decided by the Court of

Appeals of Maryland that the taxes are not 'due and payable' until January 1st of the following year."

The impact of these local tax laws on the condemnation procedure in this case is such that, in my opinion, the taxes became a lien on the property on January 1, 1945, and are payable out of the fund deposited in court which, by stipulation of the parties, constituted the full valuation of the property free of liens as just compensation to the property owner under the Constitution. I think the question must be so determined without difficulty despite the elaborate argument of Pullman to the contrary.

The principal contention of the property owner is that in substance there was a taking by the government of the property in fee effective as of September 30, 1944, although, as the contention runs, the bare technical legal title did not pass until the deposit in court on May 25, 1945. This contention runs counter to the nature and effect of the condemnation procedure in this case.

■ The general rule with respect to the allowance of taxes out of a fund in court in condemnation cases which represents the value of the whole property free of liens is that taxes must be paid from the fund if they constitute liens upon the property at the time the title passes. This has been held in at least two recent decisions of this Fourth Circuit. Coggeshall v. United States, 95 F.2d 986, 987, 990; South Carolina Public Service Authority v. 11,754.8 Acres of Land, 123 F.2d 738, 741. To the same effect are United States v. 150.29 Acres of Land, 7 Cir., 135 F.2d 878; United States v. 12,918.28 Acres, D.C.La., 51 F.Supp. 755; United States v. 125.71 Acres, D.C. Pa., 54 F.Supp. 193, 195. Although the government was in actual possession of the property under the Second War Powers Act, it is entirely clear, and indeed is not disputed, that the title to the property in this case did not pass to the government until May 25, 1945. And this mere possession by the government of the property did not preclude the attachment of the tax liens. United States v. 150.29 Acres of Land, 7 Cir., 135 F.2d 878; United States v. 12,918.28 Acres of Land, D.C., 51 F. Supp. 755, and United States v. 125.71 Acres of land, D.C., 54 F.Supp. 193.

Counsel for Pullman argued that the tax lien did not attach because in substance the property was owned by the government on September 30, 1944; but this view is quite untenable. It is true, of course, that government owned property is not subject to local taxation and in some cases mere technicalities with respect to the legal title may for this purpose be disregarded. United States v. County of Allegheny (Mesta Machine Co.), 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209. But this principle is not applicable here. The government obtained no substantial ownership in this property prior to the payment of the fund into court on May 25, 1945. Theretofore it had only bare possession under the Second War Powers Act and indeed its right to condemn the property had been constantly opposed by the property owner. It is no impairment of the principle that government property is not subject to state taxation to give effect to local tax laws of the kind here involved when the lien of the tax becomes fixed before the government takes title or ownership. United States v. Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L. Ed. 1327.

■ There is a marked difference with respect to acquisition of title or ownership by the government between an ordinary condemnation case in accordance with the Maryland procedure where the government only seeks to condemn without making a deposit under 40 U.S.C.A. § 258a, and where, on the other hand, co-incident with the institution of the condemnation proceeding, or during its pendency, the government does make the deposit under section 258a. In the ordinary condemnation procedure, without deposit, the government obtains neither possession nor title until there is a final judgment in the case in favor of the government establishing the right to condemn and the compensation to be paid to the property owner, and the amount is paid. Then only is there a "taking". And this was the procedure in the present case up to the time the deposit was made. The mere taking of actual possession by the government under the Second War Powers Act did not change the nature of the procedure so far as the condemnation case in court was concerned. And in the instant case there was not even an order for possession passed by the court. I do not understand that it is even contended that a mere physical possession taken by the government under the Second War Powers Act could vest in the United States any title or ownership of the property, but results merely in actual possession and use by the government under the War Powers.

While this condition lasts the owner still remains liable for accruing local taxes on the property.

█ Quite different is the effect of the procedure taken under 40 U.S.C.A. § 258a. That procedure may be exercised both in war and in peace. The section derives from the Act of Feb. 26, 1931, Chap. 307, § 1, 46 Stat. 1421. By it at any time before judgment in a condemnation case the government may file a declaration of taking particularly describing the estate or interest taken, accompanied by a deposit in court of the sum of money estimated to be just compensation. When such a statement and deposit are made and filed, it is provided by the statute that the "title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America"; and the court may pass an order fixing the time within which and the terms upon which the parties in possession of the land shall be required to surrender possession to the United States. The amount of the deposit representing the merely estimated just compensation is, of course, not conclusive. The just compensation remains to be finally determined by the court or jury, and if the verdict is in excess of the amount of the deposit judgment for the deficiency is given against the United States, including interest on the deficiency to the date of payment. But even when that procedure is followed the United States does not immediately obtain an indefeasible title until final judgment as due process clearly requires a reasonable opportunity to the property owner to contest the validity of the taking. Catlin v. United States, 65 S.Ct. 631. As no substantial ownership, either legal or equitable, was obtained by the government in this property prior to May 25, 1945, there is no basis for the contention that the tax lien did not attach on January 1, 1945.

█ Counsel for Pullman also make substantially the same argument in a different form. The argument is that the property was substantially taken on September 30, 1944, one day before the date of finality for the City taxes as above explained; and that under the well established federal law determining the measure of just compensation the value of the property on that date, before it was subject to 1945 taxes, together with interest on that valuation until time of payment, was the measure of just compensation. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L. Ed. 336, 147 A.L.R. 55; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. Rogers, 255 U.S. 163, 41 S.Ct. 281, 65 L.Ed. 566. And in this connection it is further argued that as the value of the property must be fixed as of September 30, 1944, when no taxes were due, it must be assumed that the amount finally paid into court under the agreement did not include any sum for subsequently accruing taxes. In other words, it is said that because the valuation must be considered to have been fixed as of September 30, 1944, that value could not properly have included taxes for 1945. But the argument in this form again misconceives the effect of the procedure in this case. There was no effective taking of this property by the government before May 25, 1945. Theretofore the government merely had physical possession under the Second War Powers Act. This case is, therefore, quite unlike that of United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, cited by counsel for Pullman, which was not a condemnation case at all but a suit under the Tucker Act to recover compensation for lands appropriated by the United States by flooding consequent upon the construction of a dam. Furthermore, the valuation as finally arrived at by stipulation on May 15, 1945, clearly envisaged the possibility if not the probability that taxes would have to be paid from the fund deposited as agreed upon because it was expressly provided in the order of court that the sum deposited represented the value of the property free of all liens; and there was a further stipulation to the effect that if the taxes were found due they should be paid from the fund deposited. There is therefore no merit in the contention that the valuation was made exclusive of the tax liens. If the issue as to valuation had been tried before a jury on May 15, 1945, instead of settled by agreement, the property owner could have asked for a special instruction with respect to the valuation as affected by the tax claim. See South Carolina Pub. Serv. Authority v. 11,754.8 Acres, 4 Cir., 123 F.2d 741.

█ In fact the date of September 30, 1944, made the basis for the chief argument for Pullman in this case, has no important significance as to this tax question. The government's attempted amendment on that date of the petition to condemn was

not allowed until March 8, 1945, after further amendment on January 8, 1945. Even if it had been allowed on September 30, 1944, it could not have prevented the subsequent accrual of the taxes for 1945, as it constituted (without a deposit) no more than a petition to condemn, without then present effect either on title or ownership.

Counsel for Pullman also submits a subordinate contention to the effect that proper procedure under the local taxing system was lacking to effect a valid tax lien on the property on January 1, 1945, or thereafter. The first point here made is that under·the Maryland Code, Art. 81, § 27, and the Baltimore City Charter (Pub. Local Laws of Maryland), section 51, the tax rate for 1945 should have been fixed by an ordinance of the Mayor and City Council of Baltimore in November of 1944, but was not determined until approval of the ordinance by the Mayor on December 26, 1944. Without extended discussion, there is no legal merit in this contention. It is true that the local laws contemplate that an ordinance fixing the rate should be passed in November, but I believe it is not unusual for the City ordinance to be actually delayed to some date prior to January 1st of the next year. The provision in the Charter with respect to this being done in November is, I think, merely directory, and in practice is often not complied with.

Again, it is argued that October 1st is the date of finality merely with respect to the valuation of property to enable the fixing of the amount of the tax rate for the succeeding calendar year and does not of itself determine the liability of the then owner of the property for the succeeding year's taxes. That is to say, October 1st is final for the valuation amount but not for personal liability. It is true that the statutes are not expressly clear on this latter point; but it has been commonly understood in Baltimore City for many years that October 1st is the date of finality not only for the amount of valuation but also for personal liability dependent upon ownership as of that date. See Baltimore City Charter (1938) sections 217–224; In re Wells, D.C., 4 F.Supp. 329, 332, and Magruder v. Supplee, 316 U.S. 394, 397, 62 S.Ct. 1162, 86 L.Ed. 1555. And this would seem to be correct in view of the Maryland decisions in Baltimore City v. Jenkins, 96 Md. 192, 53 A. 930, and Baltimore City v. Perrin, 178 Md. 101, 108, 12 A.2d 261. But even if the contrary construction of the local law were sound it would make no difference in this. particular case. We are not concerned here with any transfer of title to the property occurring between September 30, 1944 and January 1, 1945. And indeed it is not even argued that there was any change in the title or ownership between these two dates. The critical date in the case is January 1, 1945. If the taxes were then a lien they clearly so continued until the fund was paid into court thereafter.

At the hearing it developed that in the latter part of October 1944 notice in the name of Bethlehem Company, the tenant of the property, and also the Pullman Company, had been served upon the Appeal Tax Court of Baltimore City to the effect that there was the pending condemnation litigation affecting the property which might soon result in a transfer to the United States Government of the ownership and title to the property, which, it was suggested, might preclude its taxability for 1945. It appeared further that this qualified or tentative protest had not been acted on by the Appeal Tax Court. It apparently was not filed until October 30, 1944 despite the local rule that such petitions should be filed before October first. Under the applicable administrative procedure affecting local taxation the action of the Appeal Tax Court if unfavorable to the taxpayer, might have been further appealed to the State Tax Commission and ultimately to the Court of Appeals of Maryland. When this fact developed at the hearing the court indicated its indisposition to decide the present question unless and until the administrative process affecting the taxability of the property had been finally concluded. Counsel for the Pullman Company then agreed that the administrative protest or appeal would be dismissed, and it could be considered by the court that the administrative process had been concluded adversely to the taxpayer; but without prejudice to the right of the Pullman Company to continue to contend in this case that the taxes for 1945 did not constitute a lien upon the property to be paid from the fund in court.

I conclude that the taxes in the amount of $30,596.36 did become a lien upon the property on January 1, 1945, and must be paid from the fund now in court. Counsel may submit the appropriate order for that payment to the Collector of Taxes of the Mayor and City Council of Baltimore, for both State and City taxes.